UNITED STATES of America,
Plaintiff–Appellee,

v.

Charles LEZINE, Defendant–Appellant.

No. 97–2571.

United States Court of Appeals,
Seventh Circuit.

Argued May 21, 1998.

Decided Jan. 28, 1999.

Gregory A. Adamski, Katherine E. Walz (argued), Adamski & Conti, Chicago, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, COFFEY and EVANS, Circuit Judges.

COFFEY, Circuit Judge.

On May 4, 1995, a federal grand jury in the Northern District of Illinois returned a one-count indictment, charging the defendant-appellant, Charles Lezine ("Lezine"), with possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). The defendant executed a formal written plea agreement with the Government, pursuant to Fed.R.Crim.P. 11(e)(1)(B), on December 7, 1995. On June 5, 1997, Lezine was sentenced to 135 months imprisonment, five years of supervised release, a $5,000 fine, and a $50 special assessment. Lezine appealed the sentence, contending that the Government was bound, under the terms of his plea agreement, to move for a downward departure of his base sentencing level and that the district court erred by not enforcing the agreement. The defendant also argues that only six kilograms of cocaine should have been attributed to him for purposes of determining the base offense level and that the district court erred in holding him accountable for forty kilograms of cocaine. We affirm.

## BACKGROUND

In early 1995, the Drug Enforcement Administration ("DEA") initiated an investigation of Nilesh Patel ("Patel") for potential drug activity in the Chicago, Illinois, area. On March 16, 1995, a confidential informant told the DEA that he could obtain cocaine from Patel. Several telephone conversations followed between Patel and the informant in which Patel arranged to sell the informant five kilograms of cocaine for $100,000.

On April 2, 1995, the defendant Lezine and his girlfriend, Taru Mills ("Mills"), were gambling in Las Vegas, Nevada. A friend of Lezine's in Las Vegas, Pete Lnu, introduced Lezine to Patel, who offered to pay Lezine $15,000 for transporting four large suitcases ·

Duane J. Deskins (argued), Office of the United States Attorney, Criminal Division, Chicago, IL, for Plaintiff–Appellee.

from Las Vegas to Chicago.[1] Lezine agreed and arranged to meet Patel at the Oaklawn Hilton Hotel in Oaklawn, Illinois, upon his arrival in Chicago. On October 4, 1995, Lezine and Mills flew from Las Vegas to Chicago with the four suitcases. The following afternoon, Patel met Lezine and Mills in their room at the Oaklawn Hilton.[2] During the meeting, Patel asked Mills to go into the bathroom of the hotel room. After Mills had gone into the bathroom, Patel unlocked one of the four suitcases and removed six kilograms of cocaine, which he placed in a red duffle bag. Patel then gave the duffle bag to Lezine, and the pair proceeded in Patel's minivan to the house of the DEA informant who had agreed to purchase five kilograms of cocaine. After arriving at the informant's house, Patel instructed Lezine to place the duffle bag inside the trunk of the buyer's car. When Lezine had placed the bag in the informant's car, DEA agents arrested both Lezine and Patel for possessing with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). Agents removed the bag, which contained a six kilogram brick of cocaine. Agents returned to Lezine's room at the Oaklawn Hilton and were admitted by Mills. After Mills consented to a search of the room, agents discovered thirty-four kilograms of cocaine inside the suitcases. Mills was arrested, but all charges against her were later dismissed.

On April 6, 1995, Lezine was interviewed by a pretrial services officer in advance of his detention hearing. In providing the officer with biographical information, Lezine claimed that he had been employed at Bust It Records in California for the four months prior to his arrest. Lezine claimed that he had received an associate degree from Long Beach City College and that he had attended the University of California–Berkeley for two years. He also told the pretrial services officer that he had no prior adult criminal convictions. Nonetheless, after considering Lezine's pretrial services report, the judge presiding over the detention hearing ordered that Lezine be detained.

On May 4, 1995, a federal grand jury in Illinois returned a one-count indictment, charging Lezine and Patel with possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). On December 7, 1995, Lezine executed a formal written plea agreement with the Government. In the agreement, Lezine admitted to carrying the suitcases for Patel from Las Vegas to Chicago, to observing Patel remove six kilograms of cocaine from the first suitcase, and to delivering the same six kilograms to the informant's house with Patel. Lezine stipulated that when he agreed to carry the suitcases to Chicago, he believed that they contained money derived from the sale of illegal narcotics, but not cocaine itself. The plea agreement further provided that because Lezine had no criminal history, he met the criteria set forth in section 5C1.2(1) of the United States Sentencing Guidelines, which allows district courts to sentence first-time offenders below the sentencing guideline range. Finally, the agreement provided that pursuant to section 5K1.1 of the guidelines and 18 U.S.C. § 3553(e), the Government would move to depart downward from the applicable sentencing guideline range by thirty-three percent if, and only if, the defendant gave his "full and truthful cooperation" to the Government. Under the terms of the agreement, Lezine agreed to "provide complete and truthful information in any investigation and pre-trial preparation, and complete and truthful testimony, before any federal grand jury and United States District Court proceeding, and any related civil administrative or Court proceeding."

During a plea hearing on December 7, 1995, Lezine freely and voluntarily confirmed that he understood the plea agreement and accepted all its conditions. He acknowledged that he understood the criminal history agreement and how it would enter into the calculation of his sentence. He also affirmed that the Government's obligation to move for

1. Lezine has stipulated that at this time, he believed the suitcases contained only money which he suspected had been derived from the sale of illegal narcotics.

2. Earlier in the day, Patel had stopped at the informant's house and obtained a check for $100,000 from the informant.

a downward departure was conditioned upon his "full and truthful cooperation." Specifically, Lezine responded affirmatively when the sentencing judge inquired, "[d]o you also understand that you've agreed to provide true information in the presentence process, that is, when you're interviewed by the probation officers?" After the court accepted the agreement, Lezine petitioned the court to be released on bail pending sentencing. Lezine stated that he wished to return to California in order to marry his girlfriend on December 15, 1995, and support his second child who was allegedly born two days prior, on December 5, 1995. The court allowed Lezine to be released on bond.

On February 16, 1996, the Government moved to revoke Lezine's bail based on its findings in several new pretrial service reports. The reports revealed that after his release on bond and while in California, Lezine: (1) drove an automobile without a valid license; (2) was defensive and belligerent towards his pretrial services officer, often using profanity and obscene gestures; (3) evaded electronic monitoring by notifying pretrial services that he was not at home and working from January 5 until January 31, 1996, even though he was unemployed; and (4) violated electronic monitoring on seventeen occasions. In light of these violations, the sentencing court ordered Lezine to return to Chicago immediately. Lezine did not appear as directed, so the court issued a bench warrant for his arrest on February 21, 1996. The following day, Lezine surrendered to the United States Marshal's office in Chicago.

The district court received a preliminary presentence report on February 26, 1996, and a final presentence report on May 28, 1996. The presentence report revealed that during discussions with his probation officer, Lezine contradicted the story he had related earlier to the officers concerning his activities in his hotel room in Oaklawn. Lezine now contended that he and Mills were in the bathroom of the hotel suite when Patel opened the suitcase and that he never saw the cocaine in the duffle bag until he was arrested. Also, contrary to the statement he gave during the presentence investigation

that he had no adult criminal convictions, he had in fact accumulated four prior adult convictions and was on probation at the time of his arrest. The report also brought to light several of Lezine's other prevarications. Contrary to what he had told the pretrial services officer and the probation officer, Lezine never had received an associate degree from Long Beach City College and never had attended the University of California–Berkeley. Furthermore, Lezine did not need to return to California for his imminent marriage and in order to visit his two-day-old child as he argued during the December 7, 1995, plea hearing; Lezine's second child was in fact born two weeks earlier on November 16, 1995, and he never married his girlfriend. And finally, although Lezine informed the probation officer that he had been employed at Bust It Records prior to his arrest, the company denied that the defendant had ever worked there.

Lezine offered explanations for these misrepresentations. In a written response dated May 13, 1996, he argued that he failed to disclose his prior convictions during a presentence telephone interview because he viewed his convictions as non-criminal traffic matters and he was distracted by his children who were in his presence at the time of the interview. He also alleged a personality conflict with his pretrial services officer, which supposedly caused his hostile attitude while on bail. Finally, in a second written response, dated July 2, 1996, Lezine denied that he had told his probation officer that he was in the bathroom of the Oaklawn Hilton suite when Patel opened the suitcase. Lezine contended that the probation officer's statement to the contrary was the result of a "misunderstanding."

On May 31, 1996, following the release of the final presentence report, the Government notified the trial court that it would not file a motion for downward departure pursuant to section 5K1.1 of the sentencing guidelines. The Government explained that since Lezine had failed to meet his obligation to provide "full and truthful cooperation," he had rendered himself useless as a witness. On July 2, 1996, Lezine responded by petitioning the district court to require the Government to

file the section 5K1.1 motion. Lezine claimed that the Government was guilty of breaching the plea agreement since he had provided full and truthful cooperation and was willing to testify against Patel. In a sentencing opinion and order issued on February 28, 1997, the trial judge ruled that the Government's refusal to move for a downward departure pursuant to section 5K1.1 was within its prosecutorial discretion. The judge also ruled that, for purposes of calculating the base offense level, Lezine was accountable for the full forty kilograms of cocaine discovered in the hotel room as all forty kilograms were "reasonably foreseeable" to the conspiracy. After Lezine moved for reconsideration of the ruling, the judge issued a second sentencing opinion and order on May 29, 1997, affirming the court's refusal to require the Government to make a motion for downward departure. On June 5, 1997, the trial court sentenced Lezine to 135 month's imprisonment, five years supervised release, a $5,000 fine, and a $50 special assessment.

## ISSUES

On appeal, Lezine presents two issues for consideration. Lezine contends that the Government was bound, under the terms of his plea agreement, to move for a downward departure of his base sentencing level and that the district court erred by not enforcing the agreement. The defendant also argues that only six kilograms of cocaine should have been attributed to him for purposes of determining his base offense level and that the district court erred in holding him accountable for forty kilograms of cocaine.

## DISCUSSION

*A. The Defendant's Motion for Specific Performance of the Plea Agreement*

Initially, the defendant contends that he provided full and truthful cooperation to the Government, in accordance with the dictates of his plea agreement. Lezine maintains that the false statements cited by the Government do not amount to a substantial breach of his obligations under the agreement as they are either explainable or imma-

terial. Furthermore, the defendant contends that the false statements were made to probation officers, and probation officers are not agents of the "Government," as the term is used in the plea agreement. Finally, Lezine argues that because the district court allegedly decided this issue on improper grounds, ruling that the decision whether to request a downward departure rests entirely in the hands of the prosecution, there was no adequate review of the facts underlying the Government's basis for withdrawing the section 5K1.1 motion. This failure, Lezine contends, entitles him to specific performance of the plea agreement and a remand for sentencing before a different judge. On the contrary, the Government contends that its refusal to move for a downward departure is justified on the ground that Lezine failed to provide full and truthful cooperation. Specifically, the Government points to numerous false statements and material omissions made by Lezine regarding his offensive conduct, criminal history, employment, and education.

■ The question of whether the plea agreement should have been enforced is a question of law subject to *de novo* review. See *United States v. Williams*, 102 F.3d 923, 927 (7th Cir.1996). The plea agreement at issue in the case under consideration provided in relevant part:

> At the time of sentencing, the government shall make known to the sentencing judge the extent of the defendant's cooperation, and, assuming the defendant's full and truthful cooperation, shall move the Court, pursuant to Sentencing Guideline 5K1.1 and 18 U.S.C. § 3553(e) if applicable, to depart from the applicable sentencing guidelines range or statutory minimum by 33 percent.

Thus, the language of the plea agreement reveals that the Government assumed an obligation to move for a downward departure, conditioned upon the defendant giving "full and truthful cooperation."

■ It is well-settled that in the absence of a plea agreement, the Government has broad discretion to withhold a section 5K1.1 motion. See *Wade v. United States*, 504 U.S. 181, 185, 112 S.Ct. 1840, 1843, 118 L.Ed.2d 524 (1992). In the absence of a plea agree-

ment, it is the role of the prosecutor to assess the value of any assistance provided by the defendant, and any downward departure for substantial assistance is contingent upon a motion by the prosecution. *See United States v. Burrell*, 963 F.2d 976, 985 (7th Cir.1992). Thus, in the absence of an unconstitutional motive, "a claim that a defendant merely provided substantial assistance will not entitle a defendant to a remedy or even to discovery or an evidentiary hearing." *Wade*, 504 U.S. at 186, 112 S.Ct. at 1844.

■■■ On the other hand, the Government limits its discretion when it enters into a plea agreement, as is the case here. Such agreements are contracts, and the Government is obliged under the law of contracts to fulfill any promises it makes in exchange for the defendant's guilty plea. *See United States v. Jimenez*, 992 F.2d 131, 134 (7th Cir.1993). Furthermore, breaches of plea agreements by the Government violate the defendant's constitutional rights and imperil the "honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government." *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir.1986) (citation omitted). More specifically, in circumstances where a defendant fulfills his part of a plea agreement, "if the prosecution makes and does not keep a promise to file a sec. 5K1.1 motion, and the promise is material to the plea, the court must allow the defendant to withdraw the plea and start over." *Burrell*, 963 F.2d at 985 (citation omitted).

■■■ Of course, a defendant's rights under a plea agreement are limited by what the parties in fact agreed to. *See Jimenez*, 992 F.2d at 134. Courts interpret the terms of a plea agreement in light of the parties' reasonable expectations upon entering the agreement. *See United States v. Ataya*, 864 F.2d 1324, 1330 (7th Cir.1988). In applying the rule in *Ataya*, we have recognized qualified or conditional language in plea agreements and have, on a number of occasions, excused the Government from its obligations after the defendant failed to "live up to his end of the bargain." *See United States v. Sanchez–Estrada*, 62 F.3d 981, 987 (7th Cir.

1995). Specifically, we have noted that defendants are not entitled to sentence reductions in circumstances where the Government has made such a recommendation in a plea agreement if the agreement was conditioned on the absence of evidence conflicting with the recommendation which the defendant failed to divulge to probation officers. *Id.*

> [The defendant] was fully cognizant of the fact that his two-level reduction for acceptance of responsibility was contingent upon his continued cooperation and honesty with the court, a fact which was explained to him in writing, in the plea agreement, and orally during the hearing in which he pled guilty to conspiring to possess cocaine with intent to distribute.

*Id.*; *see also United States v. Ashurst*, 96 F.3d 1055 (7th Cir.1996) (giving effect to language which relieved the Government of its obligation to recommend a sentence reduction for acceptance of responsibility upon the discovery of information providing a lack of such acceptance).

■■■ The Government, however, cannot unilaterally determine that a defendant has breached a plea agreement. *See United States v. Calabrese*, 645 F.2d 1379, 1390 (10th Cir.1981). When the prosecution seeks to escape an obligation under a plea agreement on the grounds that the defendant has failed to meet some precondition, the defendant is entitled to an evidentiary hearing. " '[O]ne requisite safeguard of a defendant's [due process] rights is a judicial determination, based on adequate evidence, of a defendant's breach of a plea bargaining agreement.' " *Ataya*, 864 F.2d at 1329 (quoting *Calabrese*, 645 F.2d at 1390). In such an inquiry, the court must determine whether there has been a "substantial breach" of the plea agreement. *See Ataya*, 864 F.2d at 1330 (citing *United States v. Wood*, 780 F.2d 929, 931–32 (11th Cir.1986), *cert. denied*, 479 U.S. 824, 107 S.Ct. 97, 93 L.Ed.2d 48 (1986)). In the absence of a finding of substantial breach on the part of the defendant, the Government must fulfill its obligations under the agreement. *See Ataya*, 864 F.2d at 1330.

In the case under consideration, the district court properly concluded that the Gov-

ernment's decision to withhold the motion could not be reviewed and emphasized that the general rule that the decision whether to request a downward departure rests entirely in the hands of the prosecution. Specifically, the trial court ruled that "the motion for downward departure hinges on whether, according to the government, defendant has provided full and truthful cooperation." The court ruled that since the defendant did not allege that the prosecution's refusal was based upon an unconstitutional motive or that it was not rationally related to a legitimate Government end, he had no grounds to challenge the prosecution's decision.

In its first sentencing opinion, the trial court relied on two cases to support its ruling. In *Burrell*, 963 F.2d at 985, one of the defendants had signed a plea agreement in which the Government had agreed to dismiss certain counts and, "in its sole discretion," move for departure if "defendant provides substantial assistance." This Court held that the Government did not breach the agreement when it declined to move for departure in that the Government had not promised to make a section 5K1.1 motion in exchange for a guilty plea, but rather had simply affirmed its discretion to move for a departure if it determined that the defendant had provided substantial assistance. *See id.* Similarly, in *United States v. Spillman*, 924 F.2d 721, 723 (7th Cir.1991), the Government stipulated in a plea agreement that it would inform the court of the defendant's cooperation and make its sentencing recommendation based upon its evaluation of that cooperation. At the sentencing hearing, the Government apprised the district judge of the extent of the defendant's cooperation, but recommended a departure upward as his extensive criminal history outweighed the value of his cooperation. *See id.* This Court held that the Government's action did not breach the agreement as the Government had simply agreed to make a recommendation on the basis of its evaluation of the defendant's cooperation. *See id.* at 725. The defendant could have negotiated for the inclusion of a specific promise to request a downward departure under section 5K1.1 if he thought it necessary. *See id.*

The cases relied upon by the district court in its second sentencing opinion also involved defendants whose plea agreements differed from the plea agreement under consideration and lacked a specific pledge by the Government to make a section 5K1.1 motion. In four of those cases, *United States v. Brigham*, 977 F.2d 317, 320 (7th Cir.1992), *Wade*, 504 U.S. at 185, 112 S.Ct. at 1843, *United States v. Smith*, 953 F.2d 1060, 1065–66 (7th Cir.1992), and *United States v. Egan*, 966 F.2d 328, 330 (7th Cir.1992), *cert. denied*, 506 U.S. 1069, 113 S.Ct. 1021, 122 L.Ed.2d 167 (1993), there was either no plea agreement or no promise of a section 5K1.1 motion in the plea agreement. In one other case cited by the sentencing court, *United States v. Fairchild*, 940 F.2d 261, 266 (7th Cir.1991), the plea agreement provided only that "if the defendant provides substantial assistance in compliance with § 5K1.1 of the United States Sentencing Commission Guidelines, and 18 U.S.C. § 3553(e), the government agrees to recommend a downward departure . . . ." In *Fairchild*, this Court held that the "substantial assistance" provision, rather than giving away the Government's discretion, simply reaffirmed the options available under the law. *See id.* The Government thus had sole discretion to determine whether the defendant provided substantial assistance meriting a downward departure. *See id.*

In the case under consideration, both parties agree that the sentencing court erred in accepting the Government's argument that even in the circumstance where the Government had conditionally pledged to make a section 5K1.1 motion, it had unfettered discretion to refuse to make that motion. The cases the district court relied on in reaching this conclusion are distinguishable from the present case—*Burrell* and *Spillman* explicitly preserved the right to move for a downward departure solely to the discretion of the Government. Similarly, the plea agreement in *Fairchild*, 940 F.2d at 266, provided that the Government would recommend a downward departure "if the defendant provided substantial assistance." This "substantial assistance" language duplicates that of section 5K1.1 and 18 U.S.C. § 3553(e), which allow the Government to move for a departure from the sentencing guidelines and the man-

datory minimum sentence in recognition of "substantial assistance" provided by the defendant. By borrowing the language of these provisions, the parties to the plea agreement in *Fairchild* evinced an intention to preserve the discretion afforded the prosecution under the law.

■ Conversely, the unique language of the plea agreement before this Court reveals that the Government assumed an obligation to move for a downward departure. The agreement provided that "assuming the defendant's full and truthful cooperation," the Government "shall" move the court to depart downward from the applicable sentencing guideline range or statutory minimum sentence. The plea agreement imposes a specific obligation on the Government. Since the Government has made a definitive promise to Lezine, contrary to the sentencing judge's findings, Lezine's due process rights demand that we determine whether or not he has failed to meet the precondition of "full and truthful cooperation." *See Ataya*, 864 F.2d at 1329.

■ In his dealings with the Government, Lezine repeatedly lied about his criminal history, representing himself as a first-time offender in his presentence interview and plea agreement. Lezine affirmed this misinformation during his plea colloquy and during his initial presentence interview. Furthermore, Lezine initially contended that he was in the hotel room with Patel when Patel opened one of the four suitcases and removed six kilograms of cocaine. However, Lezine's probation officer testified at a sentencing hearing that he had contradicted his statement by later claiming that he was in the bathroom with Mills when Patel opened the suitcase and that he did not know there was cocaine in the suitcases until the time of his arrest. Moreover, at his hearing on bond pending sentencing, Lezine claimed that his girlfriend had given birth to his second child two days prior, when in fact the child had been born weeks earlier. He also claimed that he needed to return to California for his imminent marriage to his girlfriend; a marriage which never took place. During his presentence interview, Lezine falsified information he gave about his graduating from

Long Beach City College and attending the University of California–Berkeley. Lezine also lied about his prior employment at Bust It Records. And finally, while under court-ordered supervision pending sentencing, the defendant routinely violated his electronic monitoring and lied about the duration of his employment in California in order to avoid electronic monitoring. This succession of falsehoods and deceptions, as well as Lezine's repeated failure to correct past misrepresentations, constituted a substantial breach of his obligation to provide "full and truthful cooperation." In light of this factual determination, the Government was relieved of its duty and had no obligation to move for a downward departure under section 5K1.1.

■ Though the trial court affirmed the Government's refusal to make its section 5K1.1 motion, Lezine claims that in ruling that he had not obstructed justice for the purposes of sentencing, the district court implicitly accepted his excuses for his failure to disclose his prior criminal history (Lezine contended that he was distracted by his children during his telephone interview and that he thought his record consisted of only traffic-related offenses which were not criminal in nature). Lezine also argues that he did not change his testimony regarding his knowledge of the cocaine and attributes the probation officer's testimony to "poor communication." He also maintains that his prevarications regarding the date of his second child's birth and his employment and education history are "irrelevant."

These contentions fall short of convincing us to come to a conclusion that Lezine's conduct did not constitute a substantial breach of his plea agreement for several reasons. In the initial sentencing opinion issued on February 28, 1997, the trial court found that Lezine had obstructed justice by failing to disclose his criminal history in his initial presentence interview. In the second sentencing opinion dated May 29, 1997, the district court reversed this holding and found Lezine's explanation "credible" given that he had admitted his prior conduct when his probation officer finally confronted him. In effect, the court ruled that while Lezine had made false statements and material omis-

sions, his excuses were sufficiently credible to rescue him from an obstruction of justice penalty. For purposes of the terms of the plea agreement, however, Lezine's explanation does not suffice. The record clearly demonstrates that the defendant failed to disclose material information. While his eventual acknowledgment of his criminal record may provide cover from the charge of obstruction of justice, this remedial action does not bring Lezine's conduct in conformity with the strict requirement of "full and truthful cooperation."

Lezine's numerous other falsifications also violated the condition of "full and truthful cooperation." By changing his story regarding his knowledge of the cocaine, Lezine rendered his overall testimony less credible for the prosecution. He cannot escape the fact that his false testimony may not be useful to prosecutors by belatedly giving the excuse that his failure to cooperate and his less than truthful testimony was the product of "poor communication" between himself and the probation officer. Similarly, Lezine's lies concerning his education and employment history cannot be dismissed as "irrelevant"; such lies are simply a pattern of fraud, deceit, and misrepresentation that serve to invalidate Lezine's potential usefulness as a witness. The plea agreement called for "full" cooperation and does not limit the scope of this obligation. During the plea colloquy, Lezine himself affirmed that "full and truthful cooperation" included veracity in statements to probation officers and he cannot escape this caveat now.

 Lezine offers two final arguments. Initially, he argues that since the district court decided the issue of whether specific performance of the plea agreement should be granted on improper grounds, an adequate review of the facts underlying the Government's basis for withdrawing the motion did not take place. However, as detailed above, our *de novo* review of the record documents a number of false statements by the defendant which provide ample support for the Government's action. Second, Lezine contends that, for purposes of the plea agreement, probation officers are not considered part of the "Government." As such, Lezine contends that his misrepresentations to probation officers did not violate the condition of "full and truthful cooperation" with "the Government." However, the defendant fails to acknowledge that this Court has repeatedly recognized that probation officers are an extension of the Government and officers of the court. *See United States v. Sciuto*, 531 F.2d 842, 846 (7th Cir.1976) ("Prejudgment based on a prehearing *ex parte* communication is as unfair when the communication comes from *a probation officer, who is an officer of the court*, as when it comes from some other course.") (emphasis added). During his plea colloquy, Lezine himself confirmed that he had "agreed to provide true information in the presentence process, that is, when ... interviewed by the probation officer." Furthermore, as the defendant failed to raise this issue until his reply brief, he has waived his argument. *See United States v. Hall*, 142 F.3d 988, 996 (7th Cir.1998).

In sum, Lezine made numerous false statements regarding his criminal history, his conduct during the offense he was convicted of, and his educational, familial, and employment history. These prevarications violated a condition of the plea agreement that the defendant cooperate fully and truthfully with the Government and therefore, the Government was under no obligation to move for a downward departure pursuant to section 5K1.1 and 18 U.S.C. § 3883(e).

### B. The Defendant's Accountability for Forty Kilograms of Cocaine

 The defendant next contends that only six kilograms of cocaine should have been attributed to him for purposes of determining his base offense level because he allegedly did not know that the three unopened suitcases contained cocaine and that the district court erred in holding him accountable for forty kilograms of cocaine. In holding Lezine accountable for all forty kilograms under section 1B1.3 of the guidelines, the court found Lezine's contention that he did not know what was inside the three suitcases "not credible" and "highly unlikely." The court ruled that, under the law of this Circuit, it was "reasonably foreseeable" for Lezine to know that the other suitcases con-

tained a controlled substance and that Lezine was responsible for the entire shipment.

In reviewing the trial court's ruling, factual findings will be overturned only if they are clearly erroneous, while the interpretation of the Sentencing Guidelines is subject to review *de novo*. *See United States v. Lozoya–Morales*, 931 F.2d 1216, 1218 (7th Cir.1991). Thus, the district court's determination as to the amount of drugs attributable to the defendant will be upheld unless it is clearly erroneous. *See United States v. Corral–Ibarra*, 25 F.3d 430, 437 (7th Cir.1994).

Section 2D1.1 of the guidelines stipulates that the base offense level for a defendant convicted of possessing with intent to distribute cocaine in violation of 21 U.S.C. § 841 is set by the Drug Quantity Table. For the possession of at least five, but less than fifteen kilograms of cocaine, the base offense level is 32. U.S.S.G. § 2D1.1(c)(3). For the possession of at least fifteen, but less than fifty kilograms, the base offense level is 34. U.S.S.G. § 2D1.1(c)(4). In this case, the district court was asked to consider whether the six kilograms of cocaine delivered to the informant or the entire forty kilograms contained in all four suitcases found in the hotel room were attributable to the defendant.

Even if a defendant claims to be unaware that he is transporting a certain quantity of contraband, the guidelines provide that he can nonetheless be held responsible for the conduct of his co-conspirators. Specifically, section 1B1.3(a)(1)(B) states that, in the case of a jointly undertaken criminal activity, "*all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity*" factor into the determination of the base offense level (emphasis added). Furthermore, commentary to the guidelines specifies that, in cases involving controlled substances, the defendant is accountable for "all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." U.S.S.G. § 1B1.3, Commentary 2. This Court has adopted this guideline principle without reservation:

> [T]he law of this circuit, which dictates that a defendant in a drug conspiracy is responsible not only for the drugs with which he was directly involved *but also for any drugs reasonably foreseeable in connection with the criminal conduct that he agreed to undertake in furtherance of the conspiracy while he was a member of the conspiracy*, flies in the face of [the defendant's] argument that he should be liable for only the cocaine directly attributable to him. *See Nichols v. United States*, 75 F.3d 1137, 1141 (7th Cir.1996) (citing U.S.S.G. § 1B1.3(a)(1)). A defendant is responsible for the acts of his co-conspirators if those acts *(1) were reasonably foreseeable to the defendant and (2) were in furtherance of the conspiracy*. *See Pinkerton v. United States*, 328 U.S. 640, 646, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946). The rule in *Pinkerton*, known as the "aggregation rule," allows the district court to "aggregate all the quantities of drugs involved in an entire, basic scheme of multiple defendants when it determines an individual defendant's base offense level." *United States v. Taylor*, 72 F.3d 533, 547–48 (7th Cir.1995) (citations and internal quotations omitted). This Court has repeatedly adopted the Supreme Court's *Pinkerton* standard. For example, in *United States v. Tolson*, 988 F.2d 1494, 1503 (7th Cir.1993), the defendant was arrested for distributing 358 pounds of marijuana, but was later convicted by the trial court for being part of a conspiracy that distributed between 3,000 and 4,000 pounds of marijuana. This Court, implicitly adopting the *Pinkerton* rule, held that the amount of narcotics considered in sentencing a co-conspirator for a given conspiracy includes "not only the amount involved in the transactions ... but also those that were reasonably foreseeable, reflecting the fact each conspirator is responsible for the acts and offenses of each one of his co-conspirators committed in the furtherance of the conspiracy." *Id.* at 1502 (citation and internal quotation omitted). In affirming the trial court's conviction, the Court concluded that the defendant was "not hired to help off-load a single shipment [of marijuana] but was an active participant in the drug conspiracy. He aided in harvesting and transporting three or

four loads of marijuana, was present at another delivery ... and knew of other conspirators involved." *Id.* at 1503 (internal quotation omitted).

*Gray–Bey v. United States,* 156 F.3d 733, 740–41 (7th Cir.1998). This Court has previously held that conduct of a coconspirator can be considered reasonably foreseeable to a particular defendant "if that defendant has demonstrated a substantial degree of commitment to the conspiracy's objectives, either through his words or his conduct." *United States v. Edwards,* 945 F.2d 1387, 1393–94 (7th Cir.1991). As our sister circuit observed, "a defendant who conspires to transport for distribution a large quantity of drugs, but happens not to know the precise amount, pretty much takes his chances that the amount involved will be quite large." *United States v. De La Cruz,* 996 F.2d 1307, 1314 (1st Cir.1993), *cert. denied,* 510 U.S. 936, 114 S.Ct. 356, 126 L.Ed.2d 320 (1993).

In the case under consideration, the defendant maintains that he did not know that the suitcases he was transporting contained cocaine. Even if we were to give credence to Lezine's claim that he did not know of the contents of the suitcases before arriving in Chicago, he certainly knew after Patel opened the first bag. By leaving the remaining suitcases in his hotel room and by involving himself in the distribution of the first six kilograms, Lezine demonstrated a "substantial commitment" to the intended distribution of the entire shipment required by *Edwards*. By declining to distance himself from Patel after he allegedly discovered Patel's true intentions, the possibility that the scope of his agreement with Patel involved the disposal of all forty kilograms of cocaine was reasonably foreseeable.

 Furthermore, the trial judge found Lezine's statement that he did not know the contents of the suitcases "not credible," ' and Lezine has supplied nothing to convince this Court otherwise. Section 1B1.3(a)(1)(A) of the guidelines states that a defendant must be held accountable for "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." In the situation where a defendant knowingly transports a suitcase containing illegal drugs, he is accountable for all the contraband regardless of whether he knows its amount or type. *See Taylor,* 72 F.3d at 541 (citing U.S.S.G. 1B1.3). "[I]n a drug distribution case, according to the Guidelines Commentary, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction." *Id.* (citation, internal footnote, and internal quotations omitted); *see also United States v. Garcia,* 66 F.3d 851, 859 (7th Cir.1995); *United States v. de Velasquez,* 28 F.3d 2, 5–6 (2nd Cir.1994). This Court defers to the sentencing court's credibility determination because the presiding judge is in the best position to evaluate a witness's verbal as well as nonverbal behavior. *See United States v. Edwards,* 115 F.3d 1322, 1325 (7th Cir.1997). Since the trial judge made the determination that Lezine knew he was transporting contraband from Las Vegas to Chicago, Lezine is accountable for the full forty kilograms as he "aided" and "willfully caused" the transport of all forty kilograms under section 1B1.3(a)(1)(A) of the guidelines.

In sum, under section 1B1.3 of the guidelines, we agree with the trial court's finding that Lezine is accountable for forty kilograms of cocaine because of his direct participation in the drug conspiracy including, but not limited to, his transportation and distribution of the entire shipment. Furthermore, the distribution of the full forty kilograms of cocaine was a reasonably foreseeable result of the conspiracy pursuant to this Court's standard in *Gray–Bey*.

## CONCLUSION

The trial judge did not err in refusing to enforce Lezine's plea agreement. Under the terms of the agreement, the defendant was not eligible to receive a downward departure of his base sentencing level because he failed to cooperate fully and truthfully with the Government. Furthermore, the trial court did not err in holding the defendant responsible for forty kilograms of cocaine for sentencing purposes because such a quantity

was a reasonably foreseeable result of his criminal conspiracy.

AFFIRMED.